IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

PAMELA JOHNSON-MASSIE,
         Plaintiff,

vs.                                                     Case No. 3:05cv322/LAC/EMT

JO  ANNE  B.  BARNHART,
Commissioner of the
Social Security Administration,
         Defendant.

_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (the Act) and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for supplemental security income (SSI) benefits under Title XVI of the Act.[1]

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.       PROCEDURAL HISTORY

This suit involves an application for SSI benefits based on disability.  Plaintiff's application

_____

[1]In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits (DIB) or SSI.  However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. § § 404, 416).  Therefore, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

was denied initially and on reconsideration (Tr. 15).[2]  On February 24, 2005, following a hearing, an administrative law judge (ALJ) rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 15-31).  On June 16, 2005, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 4-6).  The Appeals Council's action made the ALJ's decision the final decision of the Commissioner and, therefore, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  Plaintiff's appeal from the final decision of the Commissioner is now before this court.

II.   FINDINGS OF THE ALJ

On February 24, 2005, the ALJ made several findings relative to the issues raised in this appeal (Tr. 15-31).  The ALJ found as follows:

1)   Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability.

2)   Plaintiff's "status post L4-5 posterior 360 degree instrumentation fusion with transition syndrome with resultant levoscoliosis and low back pain" are considered "severe."

3)   Plaintiff's medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4)   Plaintiff's allegations regarding disabling symptoms and limitations are not considered entirely credible for reasons set forth in the body of the ALJ's decision.

5)   Plaintiff has the following residual functional capacity (RFC): the ability to occasionally and frequently lift/carry ten pounds; stand/walk for a total of at least two to three hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; limitlessly push/pull, other than as shown for lifting/carrying abilities; and occasionally climb, balance, stoop, kneel, crouch, and crawl. Plaintiff should avoid concentrated exposure to vibration and hazards.

6)   Plaintiff's medically determinable impairments do not prevent her from performing her past relevant work.

7)   Plaintiff was not under a "disability" as defined in the Act at any time through

---

[2] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on November 1, 2005 (Doc. 5).

February 24, 2005, the date of the ALJ's decision
(Tr. 30-31).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps.  The steps are:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.    Personal History

At a hearing before an ALJ on October 27, 2004, Plaintiff testified as follows (Tr. 264-83). Plaintiff stopped working because she injured her tail bone, spine, and two discs in 1995 (Tr. 271). She had surgery in 1997, which she believes was unsuccessful because prior to the surgery her "spine was a mild 80 degree curve. And now it is measured at 42 degrees." (id.).   Plaintiff also

underwent pain management and epidural blocks (*id.*).

Plaintiff testified that she has severe hip pain, constant back pain, and leg pain (Tr. 272). Her left leg buckles when she walks (*id.*). She also has arthritis in her hands and arms, carpal tunnel syndrome, and depression (*id.*). She is unable to do housework because it increases her pain (*id.*). Plaintiff is able to walk about half a block (Tr. 269). She uses a back brace and sometimes a cane (*id.*). Plaintiff can stand only thirty seconds before her pain becomes so severe she must sit down (Tr. 270). She can sit in a chair for approximately half an hour (*id.*).

Plaintiff has taken OxyContin for her pain every twelve hours since 1996, and it controls the pain "somewhat" (Tr. 271). Plaintiff also lies down, uses a heating pad, and occasionally gets in her spa to decrease the pain (Tr. 272). In addition to the OxyContin, Plaintiff takes Soma and Elavil (Tr. 273). Her medications make her drowsy and lethargic (*id.*).

Plaintiff indicated that she objected to the opinions of Dr. Koulisis, stating that he rendered an opinion on facts he could not have known because he did not examine her (Tr. 267). According to Plaintiff, Dr. Koulisis' nurse asked her questions, then the doctor read her x-ray, but he did not examine her (Tr. 274). According to Plaintiff, Dr. Koulisis said he did not want to touch her because her x-ray looked "hideous" (Tr. 274-75).

B.      Relevant Medical History

1.      Lumbar Spine x-ray

An x-ray of Plaintiff's lumbar spine was taken April 26, 1998 (Tr. 136). The x-ray revealed an L4-L5 fusion with posterior metallic devices present and cage-like devices in the L4-L5 disc space (*id.*). Additionally, moderate levoscoliosis[3] was noted near the thoracolumbar junction (*id.*). No acute abnormality was identified (*id.*).

2.      Emergency Room Visits

On May 2, 1999, Plaintiff was seen in the emergency room at West Florida Regional Medical Center (West Florida) with an acute exacerbation of chronic low back pain (Tr. 137). Plaintiff reported that she was taking 20 milligrams (mg) of OxyContin twice a day, but had been out of medication for the previous three days (*id.*). She further reported that the OxyContin was prescribed

---

[3]Levoscoliosis is a curve in the spine that points to the left. Levoscoliosis, http://www.spinalinjuryfoundation. org/101_new/Read7835522211MRI844333/levoscoliosis.htm (Last visited July 28, 2006).

by Dr. Mixon and "her physician in Louisiana as well as her physician in Tennessee" (*id.*).  On examination, Plaintiff had mild to moderate tenderness over the lumbosacral area diffusely and no sciatic notch tenderness (*id.*).  Her straight leg raising was equivocal, and her deep tendon reflexes and motor and sensory exam were preserved (*id.*).  The remainder of the physical examination was unremarkable (*id.*).  Plaintiff was given a prescription for Lortab; however, she was instructed to follow up with Dr. Mixon for further OxyContin (*id.*).  Additionally, it was noted that there would be no further narcotic prescriptions given to Plaintiff from the West Florida emergency room (*id.*).

On July 14, 2000, Plaintiff was seen in the West Florida emergency room with complaints of back pain, severe muscle spasms, continuous abdominal pain, vomiting, diarrhea, and possible pregnancy (Tr. 138-39).  It was noted that she had been taking 40 mg of OxyContin twice a day, prescribed by Dr. Whibbs and Dr. Mixon, as well as her physicians in Louisiana and Tennessee, until she was incarcerated on July 10, 2000 (*id.*).  On examination, Plaintiff had moderate paralumbar spasm and tenderness with no sciatic notch tenderness (*id.*).  She had essentially full range of motion of the lumbar spine (*id.*).  Plaintiff was diagnosed with near syncope by history, acute abdominal pain, acute pancreatitis, diarrhea, dysuria, low back pain and muscle spasm, and status post Harrington rod placement, remote (*id.*).  The physician elected to treat Plaintiff's pancreatitis with outpatient therapy (*id.*).  She was instructed to stay hydrated, and she was prescribed Darvocet and Phenergan for pain and nausea (*id.*).

On July 10, 2001, Plaintiff was seen in the emergency room at Baptist Hospital with complaints of back pain, abdominal pain, and blood in her urine (Tr. 141-55).  Plaintiff stated that she had been taking Dilaudid and OxyContin for many years and requested refills (Tr. 141).  A Record of Prescriptions from A and E Pharmacy, contained within the Baptist Hospital records, documents that Dr. Gaddy prescribed Plaintiff Diluadid and OxyContin from January 10, 2001, through May 9, 2001 (Tr. 154).  Laboratory testing revealed that Plaintiff tested positive for alcohol, benzodiazepine, and cannabinoid (Tr. 147-48).  On physical examination, Plaintiff's straight leg raise was negative, and her deep tendon reflexes were 2+ bilaterally (Tr. 142).  The clinical impression was chronic abdominal pain and back pain, and on discharge, Plaintiff was given a prescription for OxyContin #15 (Tr. 142, 144).

Plaintiff was seen again in the Baptist Hospital emergency room on September 12, 2001,

with complaints of toothache, sore throat, left jaw pain, left earache, and fever (Tr. 157-63). The clinical impression was acute pain secondary to dental caries, and Plaintiff was treated with antibiotics and Lortab 7.5 for pain (*id.*).

On October 23, 2001, Plaintiff was seen in the emergency room at Baptist Hospital for rectal bleeding (Tr. 164-71). Her current medications were noted as Elavil, Soma, OxyContin, and Toradol (Tr. 166). Triage assessment was dizziness, weakness, nausea, and lower abdominal pain (*id.*). Plaintiff left without treatment against medical advice (*id.*).

Plaintiff was seen a fourth time in the emergency room at Baptist Hospital on May 4, 2002, with complaints of vaginal bleeding, abdominal pain, and breast pain (Tr. 172-84). The clinical impression was breast tenderness and dysfunctional uterine bleeding (Tr. 175). Plaintiff had essentially normal laboratory testing and a negative pregnancy test (Tr. 178-83). On discharge she was prescribed Lortab for pain and Phenergan for nausea (Tr. 175). Plaintiff was to follow up with a gynecologist for evaluation of breast disease and uterine bleeding (Tr. 174).

3.    William Whibbs, M.D.

Medical records from William Whibbs, M.D., document that he treated Plaintiff from July 26, 1999, through July 7, 2004 (Tr. 196-231; 245-52). Treatment notes from an office visit dated July 26, 1999, document that Plaintiff was seen for her first appointment to establish primary care for problems that basically related to chronic back pain (Tr. 217-18). At that time, Plaintiff reported that she fell on a poorly installed shower seat in a motel and apparently injured three discs and had significant problems as a result (*id.*). She stated that she underwent surgery in 1997 (*id.*). Plaintiff reported that she was taking OxyContin for pain (*id.*). On physical examination, Dr. Whibbs noted that Plaintiff had a "pretty pronounced scoliotic curve with the convexity to the right. She has a lot of heaped up muscle on the left side as a result, all of which is tender." (Tr. 218). Neurologically, Dr. Whibbs thought that Plaintiff was "basically intact" (*id.*). He diagnosed her with chronic back pain related to her injury and planned to provide prescriptions for OxyContin and Colchicine (*id.*).

Dr. Whibbs' nurses' notes document that he prescribed Plaintiff OxyContin 40 mg and OxyContin 20 mg for a total of 60 mg for pain through April 2000 (Tr. 214-18). He provided a prescription for a decreased dosage, 40 mg, on May 1, 2000 (Tr. 214). During this time, Dr. Whibbs

saw Plaintiff on only one occasion, August 26, 1999, for complaints of deep cough and fever (Tr. 216).  He assessed Plaintiff with bronchitis and prescribed a Z-pack, Duratuss G, and Pancof (*id.*).

Plaintiff was next seen for an office visit on May 22, 2000, for complaints of cough and back pain (Tr. 213-14).  On examination, Dr. Whibbs noted that Plaintiff had "a lot of sort of permanent spasm involving the left side [of her back] that is tender to touch" (Tr. 214).  Plaintiff had no frank sciatic notch tenderness (*id.*).  She had pain primarily in her lower back area (*id.*).  Dr. Whibbs diagnosed Plaintiff with bronchitis and chronic back pain, and he prescribed a Z-Pack and Panmist LA (*id.*).  He also added Skelaxin for her back pain (Tr. 213).

On May 25, 2000, a nurse's note indicates that she discussed with Plaintiff that Dr. Whibbs did not feel comfortable giving her OxyContin 40 mg <u>and</u> OxyContin 20 mg (Tr. 213).  Thus, Dr. Whibbs gave Plaintiff a written prescription for OxyContin 40 mg only, to be taken once every twelve hours, and told Plaintiff that if it did not relieve her pain or control it, she needed to make an appointment to be reevaluated and possibly referred to pain management (*id.*).  However, a nurse's note from June 2000 documents that Dr. Whibbs again prescribed OxyContin 20 mg and 40 mg for a total dose of 60 mg (*id.*).

The next nurse's note is dated December 26, 2000 (*id.*).  Plaintiff was prescribed OxyContin 40 mg (*id.*).  On January 15, 2001, Plaintiff was seen for an office visit for complaints of chronic low back pain (Tr. 212-13).  Dr. Whibbs noted that Plaintiff had come to him on OxyContin and that he had maintained her on it, although he had reduced the dose slightly with some reluctance on Plaintiff's part (Tr. 213).  He further noted that he thought Plaintiff was doing reasonably well on 40 mg of OxyContin every twelve hours (*id.*).  He stated that although she continued to have problems with pain in her hip and her back, it was reasonably well controlled with the current medical regimen (*id.*).  Dr. Whibbs further noted that Plaintiff had not had a pain management evaluation in a while, which might be worth pursuing (*id.*).  Additionally, Dr. Whibbs noted Plaintiff's report that more recently she had been having right upper quadrant pain, and Plaintiff thought that she might have occasionally been running a low grade fever with it (*id.*).  On examination, Plaintiff's blood pressure was documented as 130/78 (Tr. 212).  In general, Dr. Whibbs noted that Plaintiff was well nourished and well developed (*id.*).  She had no obvious abnormalities, and she was in no acute distress (*id.*).  Her abdomen revealed pain in the right upper quadrant,

although it was not marked (*id.*).  Her back and extremity examinations were unchanged from previous visits (*id.*).  Plaintiff had a well-maintained neurologic status (*id.*).  The remainder of her evaluation was negative (*id.*).  Dr. Whibbs diagnosed Plaintiff with chronic back pain related to an injury and surgery, and he ruled out the possibility of gallbladder disease (*id.*).

A nurse's note indicates that Plaintiff called Dr. Whibbs office on January 15, 2001, and stated that she did not get her prescription for OxyContin 20 mg when she was in for her last visit (*id.*).  However, Dr. Whibbs advised that she was to take only 40 mg once every twelve hours (*id.*).  On January 24, 2001, a nurse's note documents that Plaintiff called yet another time requesting a prescription for OxyContin 20 mg, but Plaintiff's request was denied because Dr. Whibbs had reduced her dosage from 60 mg to 40 mg (*id.*).

On February 5, 2001, Dr. Whibbs saw Plaintiff for an office visit (Tr. 211-12).  At that time, he noted that Plaintiff had not tolerated the decrease from 60 mg to 40 mg of OxyContin well (Tr. 211).  She wanted to go back to the 60 mg dosage (*id.*).  Dr. Whibbs also noted that it might be worthwhile to consider an additional pain management evaluation if they were not able to keep consistent control on reasonable doses (*id.*).  Dr. Whibbs further noted that Plaintiff had chronic problems with sleeping and had responded well to Ambien in the past (*id.*).

On examination, he noted that Plaintiff's ears, eyes, nose and throat were stable (*id.*).  Her abdomen was unremarkable (*id.*).  Plaintiff's back examination revealed chronic palpable and visible muscle spasm involving the lumbar paraspinal musculature that extended from the mid thoracic area down into the sciatic notch area, where she was significantly tender (*id.*).  Plaintiff had a positive straight leg raise on the left, but not on the right (*id.*).  She possibly had a small decrease in strength in the left quadriceps (*id.*).  Deep tendon reflexes were 2+ and symmetric, and she was able to heel and toe walk without difficulty (*id.*).  Dr. Whibbs diagnosed Plaintiff with chronic back pain that was now narcotic dependent and noted that she had failed conservative measures (*id.*).  He also diagnosed Plaintiff with bronchitis, noting that she was a smoker (*id.*).  Dr. Whibbs prescribed Naproxen 500 mg, increased Plaintiff's OxyContin back up to 60 mg, and planned to decrease her OxyContin again when she was taking anti-inflammatories and her pain was better controlled (*id.*).  He also prescribed Ambien 10 mg for sleep and a Z-Pack and Mucofen for her bronchitis (*id.*).

Dr. Whibbs' nurse's notes from February 21, 2001 through April 4, 2001, document that he

continued to prescribe Plaintiff 60 mg of OxyContin (Tr. 210).  Dr. Whibbs saw Plaintiff on May 4, 2001, for a periodic evaluation for chronic OxyContin maintenance (Tr. 209-10).  He noted that he tried to decrease Plaintiff's dose unsuccessfully (Tr. 210).  Plaintiff was now asking to further increase the dosage (*id.*).  Dr. Whibbs noted that Plaintiff was currently on Aleve, but no regular anti-inflammatory (*id.*).  He also noted that she had taken no muscle relaxers and had not been through any recent physical therapy, but she did water aerobics for exercise, which seemed to help some (*id.*).

On examination, Plaintiff's blood pressure was 122/62 and her weight was 135 pounds (*id.*). In general, Dr. Whibbs noted that Plaintiff looked well (*id.*).  Her back examination revealed tenderness in the lumbar paravertebral musculature (*id.*).  Plaintiff's straight leg raise was positive on the left and negative on the right (*id.*).  She had symmetric but poor quadriceps strength bilaterally, and her deep tendon reflexes were 1+ bilaterally (*id.*).  Dr. Whibbs assessed Plaintiff with chronic back pain and planned to maintain her current dose of OxyContin and add Celebrex 200 mg (*id.*).

On June 29, 2001, Plaintiff was seen in follow up (Tr. 209).  A hepatitis serology indicated that Plaintiff was positive for Hepatitis C (*id.*).  Plaintiff denied any IV drug usage, and it was further noted that she received a blood transfusion during her back surgery in 1997 (*id.*).  An examination of Plaintiff's abdomen revealed no hepatosplenomegaly, mass, or tenderness (*id.*).

On July 27, 2001, Dr. Whibbs' nurse's notes document that Plaintiff picked up a prescription for 80 mg of OxyContin (*id.*).  Plaintiff reported that she was in pain and that her mother was in critical condition in Nashville and she was flying out that day to be with her (*id.*).

Dr. Whibbs' nurses' notes through March 11, 2002, document that he continued to prescribe 80 mg of OxyContin in addition to muscle relaxers such as Soma and Flexeril (Tr. 206-08).  Plaintiff returned to Dr. Whibbs on April 18, 2002, for follow up on her chronic pain (Tr. 204-05).  On examination, Plaintiff had a significant amount of palpable muscle spasm, visible muscle spasm, and some torquing of the spine due to the muscle spasm (Tr. 205).  Plaintiff had tenderness down into both sciatic notches, worse on the left than the right (*id.*).  Straight leg raise was basically negative (*id.*).  Plaintiff seemed to have decreased strength in both lower extremities (*id.*).  Deep tendon reflexes were grossly symmetrical, with a possibility of some hyper-reactivity on the left (*id.*).

Again, Dr. Whibbs gave Plaintiff a prescription for OxyContin 80 mg and Soma 350 mg (Tr. 204). Dr. Whibbs' treatment notes document that he continued to prescribe these medications for Plaintiff through January 2004 (Tr. 196-204, 245-52).

Plaintiff was seen by Dr. Whibbs on May 21, 2003, for follow up on her pain medications (Tr. 196-97). Plaintiff's sensory and motor examinations were normal (Tr. 196). Straight leg raising was positive in both legs, and Plaintiff had paraspinous muscle spasm and tenderness over her lumbar vertebra (*id.*). Dr. Whibbs prescribed OxyContin 40 mg in the morning and 80 mg in the evening and continued Plaintiff's Soma (Tr. 197)

On May 27, 2003, Dr. Whibbs completed a Physical RFC Assessment (Tr. 232-33). Dr. Whibbs indicated that, during an eight-hour workday, Plaintiff could be expected to tolerate walking less than one hour, standing less than one hour, and sitting one to two hours (Tr. 232). Dr. Whibbs further indicated that Plaintiff could occasionally lift five to ten pounds and that she was restricted from climbing stairs or ladders and from bending (*id.*). Dr. Whibbs noted that kneeling was difficult for Plaintiff, secondary to her low back problem, and she required a rest period every two hours for twenty minutes (Tr. 233). He further noted that Plaintiff experiences chronic mild depression associated with her physical limitations and that her medications can cause side effects, such as drowsiness, poor alertness, and poor ability to concentrate (*id.*). It was Dr. Whibbs' opinion that Plaintiff was disabled from full-time continuous employment (*id.*).

On March 9, 2004, Dr. Whibbs prescribed Effexor XR and advised Plaintiff that she needed to make an appointment (Tr. 250). Plaintiff was seen for an office visit on March 24, 2004, at which time Dr. Whibbs diagnosed her with low back pain and a depressive disorder, NOS (Tr. 248-49). Dr. Whibbs planned to transition from Effexor back to Elavil and continued Plaintiff on OxyContin and Soma (Tr. 248-49). Dr. Whibbs indicated that Plaintiff was generally taking two 40 mg OxyContin in the morning and one at night and that she was stable on that dose (Tr. 248).

C.     Other Information Within Plaintiff's Claim File

On January 31, 2003, Plaintiff underwent a consultative examination by Richard W. Lucey, M.D., at the request of the Social Security Administration (Tr. 185-87). Plaintiff reported to Dr. Lucey that she was 38 years of age, married, and lived with her husband (Tr. 185). She further reported that she completed two years of college and had lived in Pensacola, Florida for twenty-six

years (*id.*).  Plaintiff last worked about one year prior for two months as a sales clerk (*id.*).

Regarding the history of her present illness, Plaintiff reported that she had mild scoliosis in her lower back, which was aggravated by a slip and fall, causing a marked increase in the scoliosis as well as the herniation of several discs (*id.*).  She underwent a spinal fusion at Tulane in 1997, but it did not relieve her back pain (*id.*).  Plaintiff further reported that she has had chronic low back pain with referred pain into both buttocks and posterior thighs since that time (*id.*).  She has been on various analgesics and has had epidural blocks without relief (*id.*).  She continues on high dose analgesic muscle relaxants on a regular basis, but reports that she is in a good deal of pain despite the medications (*id.*).  Plaintiff's pain is aggravated by bending, stooping, lifting, and prolonged standing and walking (*id.*).  She reported her current medications as OxyContin, Soma, and occasional Xanax (*id.*).

On physical examination, Dr. Lucey documented Plaintiff's height as five feet five inches and her weight as 135 pounds (Tr. 186).  Plaintiff's blood pressure was 118/72 and her pulse was 78 (*id.*).  Her visual acuity uncorrected was 20/25 in the right eye and 20/15 in the left eye (*id.*).  A surgical scar was noted over the lumbar sacral spine (*id.*).  Plaintiff had mild scoliosis of the thoracic spine with prominence of the musculature to the left, and she stood with a slight pelvic tilt to the right (*id.*).  Plaintiff's range of motion of the lumbar spine was noted as "grossly diminished" (*id.*).  She transferred somewhat slowly from sitting to supine due to subjective discomfort (*id.*).  Her gait was normal, and she performed heel, toe, and tandem walking without evidence of weakness or ataxia (*id.*).  Her deep tendon reflexes were normal, and her straight leg raise was negative to sixty degrees (*id.*).  She had full range of motion of all major joints of the upper and lower extremities and full range of motion of the neck (*id.*)  The remainder of her examination was essentially normal (*id.*).

Dr. Lucey's appraisals were status post lumbar fusion for disc disease and herniated disc by history and scoliosis of thoracolumbar spine with chronic low back syndrome secondary to failed surgery (*id.*).

Martha Cunningham, a Division of Disability Services (DDS) physician, completed a Physical RFC Assessment on February 13, 2003 (Tr. 188-95).  She opined that Plaintiff was able to frequently lift and/or carry ten pounds, and she could stand or walk for two to three hours in an

eight-hour workday, and sit six for hours in an eight-hour workday (Tr. 189). Her ability to push/pull was unlimited, other than by her ability to lift and/or carry (*id.*). Plaintiff was occasionally able to climb, balance, stoop, kneel, crouch, and crawl (Tr. 190). Additionally, Plaintiff was to avoid concentrated exposure to vibration and hazards, but no manipulative, visual, or communicative limitations were established (Tr. 191-92).

Another DDS physician completed a Physical RFC Assessment on September 12, 2003 (Tr. 234-41). According to the physician, Plaintiff was able to lift and/or carry twenty pounds occasionally and ten pounds frequently, and she could sit, stand, or walk for six hours in an eight-hour workday (Tr. 235). Her ability to push/pull was unlimited, other than by her ability to lift and/or carry (*id.*). No postural, manipulative, visual, environmental, or communicative limitations were established (Tr. 236-38).

Plaintiff was seen by C.W. Koulisis, M.D., at the request of DDS on August 9, 2004 (Tr. 253-55). Dr. Koulisis documented that Plaintiff's chart had been reviewed in detail and that all pertinent data was incorporated into his report, including Dr. Whibbs' medical records (Tr. 253). Plaintiff reported that she had injured her low back in 1995 when a bath chair collapsed, and she ultimately underwent an instrumented fusion at L4-5 (*id.*). Plaintiff complained of back pain and pain radiating down her left leg, which markedly affected her activities of daily living (*id.*). She denied any long tract signs of neurogenic sphincter disturbance (*id.*). She had undergone epidural steroid injections without any alleviation of her symptoms (*id.*). A review of systems was significant for "heart murmur" and Hepatitis C (*id.*). Plaintiff's current medications were reported as Toprol, Spironolactone, Soma, Elavil, and OxyContin (*id.*).

On physical examination, Dr. Koulisis documented Plaintiff's height as five feet seven inches and weight as 135 pounds (Tr. 254). He reported that Plaintiff was able to arise without difficulty, and upon standing, she had a normal cervical lordosis, thoracic kyphosis, and lumbar lordosis (*id.*). She also had a normal gait and was able to heel, toe, and tandem walk without difficulty (*id.*). On examination of the cervical spine, Plaintiff's range of motion was within normal limits (*id.*). She had a negative Spurling's sign and no palpable spasm (*id.*). Her motor strength was 5/5 and her reflexes were 2+ and equal (*id.*). Plaintiff's sensation was intact to light touch, pinprick, and vibration (*id.*). On examination of Plaintiff's shoulders, her range of motion was within normal

limits (*id.*).  She had a negative sulcus sign and negative impingement sign (*id.*).  She also had negative provocative testing confined to the supraspinatus (*id.*).  On examination of Plaintiff's elbows, her range of motion was within normal limits, and her elbows were stable to all stresses (*id.*).  She had a negative Tinel's sign overlying the cubital tunnel bilaterally (*id.*).  On examination of her wrists and hands, her range of motion was within normal limits, and they were stable to all stresses (*id.*).

On examination of Plaintiff's thoracolumbar spine, her range of motion was within normal limits (*id.*).  She had a well-healed midline incision (*id.*).  No palpable spasm was noted (*id.*). Plaintiff's motor strength was 5/5, and her reflexes were 2+ and equal (*id.*).  Her sensation was intact to light touch, pinprick, and vibration, and she had negative tension signs sitting and lying bilaterally (*id.*).  Plaintiff also had negative provocative testing confined to the sacroiliac joints bilaterally (*id.*). X-rays of the lumbar spine revealed instrumentation interbody fusion at L4-5 with subsequent transition above the level of the fusion with a moderate levoscoliosis (*id.*).

Range of motion of Plaintiff's knees was documented as zero to 130 degrees bilaterally, and she had normal patello-femoral mechanics throughout the range of motion (Tr. 254, 257).  Her knees were stable to all stresses including anterior, posterior drawer, and Lachman's, as well as varus and valgus stressing (Tr. 254).  Range of motion of Plaintiff's ankles/feet was within normal limits and they were stable to all stresses (*id.*).  Dr. Koulisis' impression was status post L4-5 posterior 360 degree instrumentation fusion with transition syndrome with resultant levoscoliosis, smoking comorbidity, and Hepatitis C (Tr. 255).  He recommended that Plaintiff follow up with her physician in New Orleans (Tr. 255, 262).

Additionally, Dr. Koulisis completed a Medical Assessment of Ability to do Work-Related Activities (Physical) (Tr. 259-62).  Dr. Koulisis indicated that Plaintiff was able to lift/carry eleven to twenty pounds frequently and up to ten pounds continuously (Tr. 259).  Plaintiff was able to sit four hours, stand two hours, and walk two hours at one time without interruption, and she was able to sit eight hours, stand four hours, and walk a total of two hours in an eight-hour workday (Tr. 260). Dr. Koulisis indicated that the use of Plaintiff's hands and feet was not affected (*id.*).  Plaintiff was able to occasionally climb and balance, but never stoop, crouch, kneel, or crawl (Tr. 261).  She was able to continuously reach, handle, feel, hear and speak, but only occasionally push/pull up to ten

pounds (*id.*).  Dr. Koulisis further indicated that Plaintiff should avoid even moderate exposure to vibrations (Tr. 262).

     V.     DISCUSSION

     Plaintiff raises five issues appeal (*see* Doc. 9).  Plaintiff contends the ALJ erred by: 1) failing to properly evaluate her complaints of pain and other subjective symptoms, 2) engaging in "sit and squirm" jurisprudence, 3) failing to properly consider the side-effects of her medications, 4) failing to properly consider the opinions of treating and consultative medical sources, and 5) ignoring the opinion of the vocational expert (VE), in response to certain hypothetical questions, that Plaintiff could perform no available work (Doc. 9 at 10-21).[4]

     A.     Evaluation of Plaintiff's Complaints of Pain

     The ALJ noted Plaintiff's statements that she can only lift up to five pounds, and she can stand, sit, and walk for only brief periods of time (Tr. 25).  The ALJ also noted Plaintiff's allegations of chronic pain in her hip, back, and leg due to a failed back surgery (*id.*).  However, the ALJ found that the "objectively demonstrable evidence of record fails to support that the [Plaintiff] is as impaired as she has alleged" (*id.*).  The ALJ also noted that he was not totally discounting the fact that Plaintiff may occasionally experience some degree of pain or discomfort (Tr. 28).  However, he found that Plaintiff's "alleged pain and resultant limitations seem unreasonable when considering the medical evidence as a whole" (*id.*).

     Pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a

     [4]For organizational purposes, some of Plaintiff's claims of error will be combined in the following "Discussion" section.

severity which can reasonably be expected to give rise to the alleged pain.
The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson, supra, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[I]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true."  MacGregor v. Bowen, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole."  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a

plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain."  Scharlow v. Schweiker, 655 F.2d 645, 649 (5ᵗʰ Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[5]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, supra, at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11ᵗʰ Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In the instant case, the ALJ provided several reasons for discounting Plaintiff's allegations of pain.  The ALJ first noted that Plaintiff's "clinical examination findings have often been found to be normal or minimally abnormal, and the [Plaintiff's] allegations have been inconsistent with the clinical examination findings and objective diagnostic evidence of record" (Tr. 26).  Initially, the court notes that an x-ray of Plaintiff's lumbar spine on April 26, 1998, revealed the previous fusion and hardware as a result, but showed no acute abnormality (Tr. 136), and when Plaintiff presented to the West Florida emergency room in July 2000, she had only moderate paralumbar spasm, moderate tenderness, no sciatic notch tenderness, and essentially full range of motion of the lumbar spine (Tr. 138-39).  Additionally, as noted by the ALJ, in May 1999 Plaintiff was seen in the emergency room for chronic low back pain (Tr. 26, 137).  Despite her complaints, she had only mild to moderate tenderness over the lumbosacral area diffusely with no sciatic notch tenderness, motor

---

[5]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11ᵗʰ Cir.1981) (en banc).

and sensory examination were preserved, and the remainder of her physical examination was unremarkable (Tr. 26, 137).  Moreover, the ALJ noted Dr. Lucey's findings in 2003 that Plaintiff had a normal gait, normal deep tendon reflexes, full range of motion of all major joints in her upper and lower extremities, and full range of motion in her neck, as well as Dr. Lucey's observation that Plaintiff performed heel, toe, and tandem walking without evidence of weakness or ataxia (Tr. 26, 186).[6]  Furthermore, the ALJ noted the findings of Dr. Koulisis, a board certified orthopedic surgeon, including his findings in 2004 that Plaintiff had the ability to arise without difficulty; normal cervical lordosis, thoracic kyphosis, and lumbar lordosis; normal gait; ability to heel, toe, and tandem walk without difficulty; and a thoracolumbar spine range of motion within normal limits (Tr. 26-27, 254).  Additionally, the ALJ outlined in detail the remainder of Dr. Koulisis' findings (*see* Tr. 27), all of which reflect an essentially unremarkable examination (*see* Tr. 27, 254).  Thus, the ALJ was correct in noting that Plaintiff's clinical examinations were "normal or minimally abnormal."  Moreover, Dr. Koulisis' opinions are entitled to greater weight, even though Plaintiff has urged both the ALJ and this court to ignore them, because he is a specialist in the field.  *See* Title 20 C.F.R. § 404.1527(d)(5) (providing that "more weight [is given] to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist").

In further discounting Plaintiff's allegations of pain, the ALJ found that there were "wide gaps" between Plaintiff's treatment visits and that it was "reasonable to assume that if the [Plaintiff] were experiencing physical . . . difficulties to a disabling degree, she would have presented to her physicians for ongoing treatment" (Tr. 26).  This finding is also supported by the record.  Although it is undisputed that Plaintiff suffered a back injury and underwent corrective surgery in 1997, Plaintiff's subsequent "treatment" is limited at best.

Despite Plaintiff's allegations of disabling pain, her "treatment" consists mainly of six emergency room visits between May 1999 and May 2002, some of which are unrelated to the instant claim, one of which resulted in Plaintiff's leaving the hospital against medical advice, and most of

---

[6]Although Dr. Lucey also noted that Plaintiff's lumbar spine range of motion was diminished, she stood with a slight pelvic tilt, and she transferred from sitting to supine somewhat slowly due to "subjective" discomfort, the remainder of her examination was "essentially normal" (Tr. 186).

which involved her attempts to obtain prescription pain medication.  Her only other "treatment" is that provided by Dr. Whibbs.  Plaintiff sought treatment from Dr. Whibbs based upon her self-report of a "failed" fusion surgery and resulting need for pain medication, even though the x-ray revealing her fusion showed only a mild curvature of her spine and no acute abnormalities.[7]  Most of the records from Dr. Whibbs' office are nurses' notes, reflecting Plaintiff's contact with the office primarily for obtaining prescriptions and refills of medication (*see* Tr. 214-16).  Moreover, the notes reflect Dr. Whibbs' belief that Plaintiff was doing well on 40 mg of OxyContin, and that he reluctantly agreed to her repeated requests for a higher dosage, noting that her pain was "reasonably well controlled" with the lesser amount (Tr. 213).

The ALJ found it noteworthy that the record contained no evidence of any hospitalizations since Plaintiff's alleged onset of disability (Tr. 28).  A claimant's failure to seek treatment is a proper factor for the ALJ to consider, *see* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984), and allegations of disabling pain may be discounted because of inconsistencies such as conservative medical treatment.  Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996).

In objecting to the ALJ's finding that she has failed to seek aggressive and/or continuous treatment, Plaintiff alleges she "has tried just about everything to alleviate her chronic back pain," including injections and blocks in 1999 (*see* Doc. 9 at 3).  In support, Plaintiff has referred the court to an entry made in a nurse's note in Dr. Whibbs' records on September 24, 2001, which states "It's been about 2 years since she's had any formal pain management evaluation.  She apparently underwent a series of trigger point injections, epidural steroid injections and caudal blocks achieving no more than a week's worth of improvement." (*id.*; Tr. 207).  Although the record contains medical evidence from April 1998 through August 2004, there are no records reflecting that Plaintiff underwent injections and blocks.  Nevertheless, it is clear that Plaintiff sought no "treatment" other than pain medication from 1999 through 2004, never pursued corrective surgery, never was hospitalized, and was specifically told by staff at West Florida that she would receive no further

---

[7]Plaintiff states that her surgery has been described as a "failure" by at least one physician (Doc. 9 at 12).  Plaintiff is referring to Dr. Lucey (*see* Tr. 186).  However, Dr. Lucey appears to have based this opinion on information provided by Plaintiff, as his report does not indicate that he reviewed Plaintiff's x-ray or the records from Dr. Whibbs' office.  The objective medical evidence demonstrates a "failure" to the extent that the fusion resulted in levoscoliosis (Tr. 136), a leftward curvature of the spine; however, Dr. Lucey noted that the scoliosis was "mild" (*id.*).

narcotic prescriptions from their emergency room.

Because the ALJ articulated explicit reasons for discounting Plaintiff's allegations of pain, and his reasons are supported by the record, the ALJ did not err. Although the ALJ recognized that evidence existed regarding an underlying medical condition (i.e., Plaintiff's status post fusion with resultant levoscoliosis and low back pain) and that Plaintiff experienced some pain and discomfort, he correctly noted that there was no objective medical evidence confirming the severity of the alleged pain resulting from Plaintiff's condition, nor was Plaintiff's condition of such severity to be reasonably expected to give rise to the alleged pain.

B.      "Sit and Squirm" Jurisprudence

Plaintiff takes issue with the ALJ's observation that Plaintiff "did not appear in any acute distress" and sat comfortably during the hearing (Doc. 9 at 13; Tr. 28). The Eleventh Circuit has found it improper for an ALJ to comment upon the fact that a claimant appeared to be in no pain during the administrative hearing. Johns v. Bowen, 821 F.2d 551, 557 (11th Cir.1987); McRoberts v. Bowen, 841 F.2d 1077, 1081 (11th Cir. 1988). However, Plaintiff has not cited, nor has this court found, any authority for the proposition that such a comment requires a per se reversal of the Commissioner's decision.[8] Instead, courts have recognized the impropriety of denying benefits solely on the basis of observations made during an administrative hearing. See Smith v. Heckler, 735 F.2d 312, 318-19 (8th Cir. 1984) ("sit and squirm" analysis was one of several errors made by the ALJ, and the case required reversal based on all of the errors); Lewis v. Weinberger, 541 F.2d 417, 421 (4th Cir. 1976) (reversing denial of benefits not because of "sit and squirm" observations alone, but instead on "the record before us, [specifically] the overwhelming evidence [showing] that Lewis is totally disabled"). Moreover, the Eleventh Circuit has found it appropriate for an ALJ to consider a claimant's appearance and demeanor during the hearing, but has cautioned against discrediting a claimant's testimony solely on this basis. See Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987) (citing Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985)); see also Villa v.

---

[8]Plaintiff suggests that McRoberts requires reversal in the instant case (see Doc. 9 at 14), but Plaintiff is incorrect. The decision to reverse the Commissioner's decision and award benefits in McRoberts was based on several factors, including the medical evidence of record (including objective medical evidence confirming the severity of McRoberts' pain), improper use of the Medical Vocational Guidelines, and the ALJ's improper comment that he did not appear to be in pain at his hearing. McRoberts, 841 F.2d at 1077.

<u>Sullivan</u>, 895 F.2d 1019, 1024 (5th Cir. 1990) (exclusive reliance on demeanor in credibility determinations is inappropriate, but it is not reversible error to consider demeanor as one of several factors in evaluating credibility).  Thus, to the extent the ALJ's comments constituted a comment on Plaintiff's demeanor, they were not improper.  Otherwise, it is clear that the ALJ's decision was based on more than his mere observations of Plaintiff during her hearing, and his decision should not be reversed on the ground that he impermissibly engaged in "sit and squirm" jurisprudence.

C.     Medication Side Effects

Plaintiff alleges disabling side-effects from her medication, but the record contains no evidence of significant ongoing or specific difficulties involving any side-effects of her medication (Tr. 28, 196-231, 273).  Although Plaintiff testified that her medications made her drowsy and lethargic, Dr. Whibbs' treatment notes document that Plaintiff reported chronic difficulty sleeping, and he prescribed a sleep-aid (Tr. 28, 211).  Additionally, on January 15, 2001, Dr. Whibbs noted that Plaintiff was doing reasonably well on OxyContin 40 mg, and her pain was reasonably well controlled with the current medical regimen (Tr. 21, 213).  In May 2001, Dr. Whibbs noted that he was keeping Plaintiff on her current dose of OxyContin, despite her request for an increased dosage (Tr. 22, 210).  In asking for a higher dosage, Plaintiff failed to report any side-effects based on the current dosage and obviously felt capable of tolerating the higher dosage she sought (*see* Tr. 210).  Moreover, the majority of Dr. Whibbs' treatment notes indicate that he continued to prescribe medications for Plaintiff without noting any reported side-effects (*see, e.g.*, Tr. 22-23, 197-204, 206-10, 212-16, 218-31, 245-52).  When a claimant has not complained of medication side-effects, and the record contains no complaints of side-effects to treating physicians, there is substantial evidence to support a finding that side-effects are not a significant problem.  *See* <u>Swindle v. Sullivan</u>, 914 F.2d 222, 226 (11th Cir. 1990).  *See also* <u>Holley v. Chater</u>, 931 F.Supp. 840, 850 (S.D. Fla. 1996) (when the sole evidence of side-effects is a claimant's testimony that medication makes him "dizzy and drowsy," such "scant evidence" is insufficient to support a finding of disability).

Plaintiff alleges that her testimony is not the only evidence of the side-effects of her medication, noting a statement made by Dr. Whibbs on a questionnaire completed in May 2003 (Doc. 9 at 16; Tr. 233).  In the questionnaire, Dr. Whibbs stated that Plaintiff's medication can result in drowsiness, poor alertness, and an inability to concentrate (*id.*).  However, what is relevant to this

court is the effect of the medications on <u>Plaintiff</u>, not the <u>potential</u> side-effects of the medication on others.  Plaintiff was Dr. Whibbs' patient for more than five years, but she never indicated to him that she experienced drowsiness, inattentiveness, or any other side-effect from her medication, despite repeated conversations about her medication with Dr. Whibbs and/or his nurses (*see, e.g.*, Tr. 208, 210).  On the contrary, Dr. Whibbs' records reflect that Plaintiff tolerated the medication "pretty well" (*see, e.g.*, Tr. 248).  She continually sought more, in higher doses, and even reported chronic sleep difficulties while taking the same medications she now claims make her drowsy (*see, e.g.,* Tr. 210-11).  This court concludes that Dr. Whibbs' notation reflects only the potential side-effects of Plaintiff's medications, not his opinion on how they effected <u>her</u>.  Thus, the ALJ did not err in concluding that the record lacks substantial evidence to support a finding that side-effects of Plaintiff's medication are a significant problem.

Similarly, the ALJ was not required to include any alleged limiting medication side-effects in his hypothetical questions to the VE.  A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.   <u>Pendley v. Heckler</u>, 767 F.2d 1561, 1563 (11th Cir. 1985).  However, "the ALJ [is] not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported."

D.      Opinions of Treating and Consultative Medical Sources

Plaintiff contends the ALJ failed to properly consider the opinions of Dr. Whibbs, a treating physician, and failed to include his opinions in his hypothetical questioning of the VE.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991);  <u>Sabo v. Commissioner of Social Security</u>,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence

or is wholly conclusory.  *See* Edwards, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e).

Here, in assessing the credibility of Plaintiff's alleged symptoms and limitations, the ALJ specifically considered the May 27, 2003, medical source statement of Dr. Whibbs, in which he assessed disabling limitations and opined that Plaintiff was disabled from full-time continuous employment (Tr. 23, 25, 232-33).  However, the ALJ stated that Dr. Whibbs' opinion was not entitled to controlling weight, finding that it contained insufficient rationale "with no citation to medical evidence," and it was inconsistent with the record as a whole, including Dr. Whibbs' own clinical findings, Plaintiff's history of medical treatment, and the opinions of Dr. Koulisis and Dr.

Cunningham (Tr. 25-28).

The court notes that the opinions of Dr. Whibbs at issue are contained on a two-page questionnaire, on which answers were provided for most of the questions and selected by Dr. Whibbs simply by checking a box (*see* Tr. 232-33).  Additionally, as noted by the ALJ, the opinions contain no citation to any medical evidence to support the limitations selected, and the opinions are indeed inconsistent with the record as whole, including Plaintiff's limited history of medical treatment, as discussed above.  Moreover, the ALJ specifically noted that Dr. Whibbs' opinions were inconsistent with those of Dr. Koulisis and Dr. Cunningham (*see* Tr. 26-28).  Dr. Koulisis found that Plaintiff's physical examination was essentially normal, and he opined that she was capable of employment with some restrictions (*see* Tr. 259-62).  Similarly, Dr. Cunningham found that Plaintiff was capable of employment with some restrictions, but neither her restrictions nor those of Dr. Koulisis were as limiting as the restrictions set forth by Dr. Whibbs (*see id.*; Tr. 190-92; Tr. 232-33). Moreover, although not noted by the ALJ, another DDS physician found Plaintiff capable of working with restrictions, but those restrictions were not as limiting as the ones assessed by either Dr. Koulisis or  Dr. Cunningham (*see* Tr. 236-38).  Thus, the ALJ properly assigned little weight to the opinions of Dr. Whibbs and properly excluded them from his hypothetical questions. Furthermore, the ALJ was not required to accept Dr. Whibbs' opinion that Plaintiff was "disabled from full-time continuous employment" (Tr. 233), as that is a determination reserved to the Commissioner, not to a physician.  *See* 20 C.F.R. § 404.1527(e)(1).

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED**, and that the clerk be directed to close the file.

At Pensacola, Florida this <u>28</u><sup>th</sup> day of August 2006.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**